First case for argument is Polycon Industries v. National Labor Relations Board, Mr. Johnson. May I reserve two minutes instead of three for my rebuttal? Excuse me? May I reserve two minutes rather than three for my rebuttal? That's fine, whatever you want. Thank you. This is a case wherein Polycon is asking this court to deny enforcement of an NLRB decision. The questions here are limited, and that is... We've had so much going against you. I mean, the Supreme Court has said, the Labor Board has said, if you have an agreement with the union, if you've ironed out your differences, then you're stuck. You have to sign the contract. It gives the union three years. You and the union agreed about this, you know, the business with the right to work law. You agree. That's Indiana law. It governs. That's it. Your Honor, respectfully, we did not come to an agreement. Of course you did. You came to an agreement. Now, you may be concerned that the last redaction of the agreement contains a typo or something, but the union has agreed. You don't even need it in the contract. Obviously, Indiana law predominates, right? If Indiana says right to work law, which states are allowed to have right to work law, that's it. The union can't force the employer to hire, cannot require the employer to require the workers to belong to the union. Simple as that. Well, it would be, had we been bargaining at the table, and had the client had the opportunity... You agreed. The union agreed that they were going to put in the contract this right to work thing to make clear that they couldn't force the members to join the union. They agreed to that. They did. And as you'll see in the record, the exchanges that occurred at the end were between Mr. Berkowitz and myself that were by email. So, in the March 11th email to Harvey Jackson, who was the union negotiator on the other side, when we began communicating by email, what I told Mr. Jackson was, I needed to get approval from the client, because we were no longer bargaining across the bargaining table. I was receiving emails. We continued to bargain, and ultimately what I received from Mr. Berkowitz, from Mr. Jackson first, was a draft that's in the record that looks a bit like this. Bargaining in this case took much longer than it should have for a variety of reasons. In the draft document that's part of the record, what I didn't realize until yesterday, is that the crazy quilt of letters that you see on a diagonal in the record is the watermark that says draft only 3-2013. Now, in the copy that got into the record, for some reason apparently the photocopier picked up... Was there not an agreement? There was not, sir. You mean the union has not agreed that the right to work law prevents them from requiring all the workers to belong to the union? Is that what you're saying? No, sir. I'm not saying that at all. What I'm saying is that as we neared the end of negotiations, Mr. Berkowitz and I were working to come to an agreement that we could submit to our parties. But you have agreed. Everybody's agreed. No, the employer had not agreed. What is the disagreement? The employer had not agreed. What is the disagreement? What is the current disagreement? Well, we don't know, but what did happen... You don't know what the disagreement is? There is no meeting of the mind, sir, if the client... Oh, come on. Your Honor, the client never had the opportunity to see the final... But the union has agreed that the right to work law takes precedence over any other term in the contract. And ultimately the draft of the agreement, the draft of the agreement pursuant to Mr. Berkowitz's email was going to be submitted to the employer for approval. We had long since stopped bargaining across the table. We were trying to get things done quickly in conformity with this court's Chicago Tribune case. Consequently, we were sending emails back and forth. It was clear from the March email that if this is the way we were going to operate, then I needed to get approval from the client. Because I didn't have client approval, I was trying to get language that would be acceptable. If we wanted to get... If there were two options, get together and bargain across the table, which I'd done with the same union on more than 50 occasions prior to this, or... You agreed. You don't understand. I don't know what you're talking about. The union has agreed, you've agreed, right to work law takes precedence over the other terms in the contract. In your opinion, sir, what part of the proposed agreement, assuming proposed agreement, does your client object to? We did not go through the agreement, Your Honor, at the end. Is there a part of what Judge Posner refers to as an agreement, is there a part of it that is anathema to your client, and if so, what is it? There is not. Either your client is in agreement on the... No, the client never had the opportunity to consider it. Did you discuss it with him since then? No. So your client has no idea of the proposed proposal? I'm sure I forwarded a copy of the proposal ultimately to the client. And did he, she, or it object to any portion thereof? They said nothing one way or the other. As we got to the end of bargaining, Judge, as Mr. Berkowitz's email said, here's a draft, send it to your client for approval. We understood that this was Mr. Berkowitz and me talking by email and that we needed to get the approval of our clients. That never happened because what happened in the interim was the knowledge of the petition, wherein the petition had signatures of more than 50% of the employees, so we never took the last step and got that approval. That's the circumstance that changed. You can't have a meeting of the minds where one client... But Mr. Johnson, why do you need a reference to the Indiana law? Why should that be in the contract? Indiana law binds. Indiana law is right to work. It doesn't have to have anything in the contract. The union can't defy Indiana law. Correct. So all you're doing is stalling. No, sir. There is no purpose served by having a reference to Indiana law in the collective bargaining agreement. Well, sure there is. No possible purpose, any more than it would be to have a provision say that the parties will obey the laws of the United States. You don't put that in your collective bargaining agreement. We do not, sir. Why do you put the Indiana law in your collective bargaining agreement? Well, the difficulty with the Indiana right to work law dealt with the original drafting of the union security agreement. The union security agreement that we agreed to... The union security agreement cannot override a law. Right? Certainly. Then why does it matter what the agreement says? Because under Indiana law, the Indiana statute says that any contract that contains a union security agreement in violation of the Indiana right to work law is void and unenforceable, and there are civil and criminal penalties that attach to that. And so the language, the specific reference to the Indiana law was irrelevant. What was important was that the language as drafted did not violate the Indiana right to work law. That was the change that needed to be made. How can language violate a law? Well, it would be the application of the law. Conduct violates the law. Conduct violates the law. Yeah. Well, of course it does. But the contract would be a void of an issue if it violated... Well, that's what the Indiana statute says. I think the Indiana legislature might have been a bit exuberant with the effect the violation of their law might have on a collective bargaining agreement. Yes, Judge. When Mr. Berkowitz accepted the union security clause language, wasn't that a complete meeting of the minds? It was not, sir. It was not, because from March on, it was clear that the last step was that I needed to take the agreement to my client because we were no longer bargaining across the table. The client wasn't involved in those. That was part of an email, and as a matter of fact, in Mr. Berkowitz's email to me, he said, here's the draft for your review. That included the review of Bill Hanson, and from March on, it was clear that the client needed to review it once we got to the end of this process. How long did it take for the client to... for you to get this to the client? Everything happened within a day. All of this happened within 24 to 48 hours, Judge. You're talking about a big delay, but everything happens in a day? No, the negotiations took a long time. The events that gave rise to the lack of a meeting of the minds all happened within 24 to 48 hours. But the union was willing to include language that was fine, right? And then you say you have to get the client's approval, but then you say it just takes a day, so I'm lost completely. Mr. Berkowitz and I were working toward a mutually agreeable tentative agreement, which we would in turn submit to our clients. And you had the tentative agreement. And we still needed to get the client's approval. But you say that just takes a day. When Mr. Berkowitz and I finally exchanged the last emails, it was one day later that we learned about the petition. Learned about the petition? Yes, sir. But that's totally irrelevant. The courts have rejected the notion that you can, that a change in the amount of support for the union wipes out a collective bargaining agreement. But we only have a collective bargaining agreement. No basis for that. I'm sorry, Judge. We only have a collective bargaining agreement if we have a meeting of the minds. And what was left to do to get a contract here was that the client needed to know what the contract was because we weren't at the bargaining table. The union understood that from March on. That's a separate issue from the loss of union support. It is a separate issue. That was the intervening factor that you raised. No, but it's not a proper factor. Look, you're swimming against a tide. You've got a lot of decisions here which make clear that there's no basis for this stalling. There was no stalling, Your Honor. You agreed on language which would make clear that, of course, Indiana law takes precedence. And why there had to be delays after that agreement, I don't understand. Your Honor, I think if you check the dates of the e-mails, what you'll see is that there was no stalling whatsoever. Nor did the client ever have notice. And all parties understood that there needed to be approval by the parties before we had a meeting of the minds. When did you have this exchange of texts that made clear that the union couldn't force the employees to join? When was that? I'm sorry? When did that happen, the exchange? When you agreed that the union couldn't force the employees to join the union? On May 9th we learned of the petition and we advised... May 9th what? 2013. It was May 7th, 2013. Forget May 7th. So that's May 9th. Now how long did it take to submit this to your company? Once we received the petition, I did not... Pardon? May 9th. How long after May 9th before this was submitted to the company and the company made a decision? The company told me... Would you answer my question? Yes, sir. It was not. Look, would you answer my question? The collective... We got to the end of bargaining, what we thought was the end of bargaining for the draft on May 7th when I received the last modification from Mr. Berkowitz. Was that information relayed to your client? The information you're talking about you got from Mr. Berkowitz? No, not at that time. So it's not... I received Mr. Berkowitz's last draft. I was to review it and then send it on to the client for his review. Did you send it on to the client? I did not because I had not reviewed it. So your answer is it never... It never was. On May 9th, we learned of the petition which petition had more than 50% of the signatures. But you know that's irrelevant. Wasn't the petition May 22nd? The decertification petition was filed on May 22nd? It was filed... The decert petition was filed with the board on May 27th. The petition itself of the employees was made known to all the parties on May 7th. I'm sorry, on May 7th. I'm sorry. I've misspoken. It was May 9th when the employer became aware of the petition. The employer advised me of the existence of the petition. I had not at that time, having only received the draft from Mr. Berkowitz 48 hours before, reviewed the document and gotten it to the client to review. I believe that to be a change in circumstance that was consistent with the Chicago Tribune case. At that point, I realized that the union no longer enjoyed majority support. It's irrelevant. We didn't bargain further after that. It's irrelevant. Once there's an agreement, then a subsequent loss of union support does not affect the collective bargaining agreement. It still has three years. Yes, sir. The client never had the opportunity to see the document, so there was no meeting of the minds because the client never saw the document in order to agree with it. Yeah, that's your fault. You didn't show them the documents. You didn't show them the documents. Well, the procedure was set out in the e-mails, both in Harvey Jackson's e-mail in March. This is just stalling. It wasn't stalling at all, Your Honor. It is stalling. Let me save you from yourself. Your time has expired. Thanks. Mr. DeCant? May it please the court? I'm Kyle DeCant on behalf of the National Labor Relations Board. Substantial evidence supports the board's... Could you maybe straighten out the calendar here? Matt lost the crucial dates. This is May 7th, May 9th, May 29th. Certainly, Your Honor. On May 3rd, the union submitted proposed language regarding the final issue to be negotiated, which was how to comply with the Andy and Ev right-to-work statute. That day, the company said, your proposed language is fine. Upon that point, there was a meeting of the minds already in effect. Could you speak a little louder, please? Yes, Your Honor. The meeting of the minds came into effect the moment the company... Between whom? Between PolyCon and the union on May 3rd, 2014. If I understand it, it wasn't submitted to the company itself. It was submitted only to the attorney. Throughout the entire collective bargaining process... Pardon? Throughout the entire collective bargaining process, Your Honor, there was never a question that company counsel was the authorized bargaining agent for much of the bargaining. What is the date you think that contract became effective between the parties? The contract became effective on May 3rd, 2013, Your Honor. Why? That was the date when the company agreed to the final issue to be negotiated. The company agreed? Yes, Your Honor. Through whom? Pardon? By whom? Who made the agreement? What party? Part of the... Company counsel on behalf of the company. You mean Mr. Johnson? Yes, Your Honor. Okay. At least we know where he stood. Okay. Absolutely, Your Honor. How did he indicate this acquiescence? He emailed the union stating, Your language is fine. And the moment he did that, Your Honor, the two parties agreed to the final substantive issue in the collective bargaining agreement. And the moment that that happened, the two parties reached a meeting of the minds on all substantive issues in the collective bargaining agreement. Therefore, PolyCon violated the National Labor Relations Act when it refused to execute the collective bargaining agreement to which it had already agreed with the union. The board's finding is supported by substantial evidence through analyzing events both before as well as during and after this May 3rd, 2013 date. Before May 3rd, the two parties had reached a meeting of the minds on all substantive issues except for the right to work statute as early as January of 2013. And in the ensuing four months, PolyCon never objected to any of those other issues and only raised concerns about a typo regarding vacation time and the right to work statute. Had PolyCon tried to go back and renegotiate any of those issues to which it had already agreed, it would have evidenced bad faith bargaining under the National Labor Relations Act. The fact that PolyCon didn't do that further supplies evidence that when it agreed with the union on the union security clause, the two parties reached a meeting of the minds. Once the parties agree to this issue, all further communications related to mere formatting issues in the collective bargaining agreement. Minor alterations to a collective bargaining agreement don't undermine a previously established meeting of the minds. So when PolyCon requested review of a written document, it's not trying to introduce a new condition precedent to the agreement because the parties had already reached a meeting of the minds. In that sense, this case is virtually identical to a previous case before this court, NLRB v. General Teamsters Local 662. In that case, the final issue that the parties agreed upon was a quid pro quo, where the company agreed that it would guarantee employment for four workers who had gone on strike in addition to the union no longer using four listed employees as part of its employee representative committee. The union agreed with the company's proposed language and then said it would submit the entire collective bargaining agreement for ratification. When the union later refused to execute the quid pro quo by claiming that it didn't submit that part to ratification, the court ruled against the union's argument and found that once there was a meeting of the minds, the union could not introduce a new condition precedent to the agreement. This case is identical because once the company stated your proposed language is fine, its request for review of the written document doesn't create a new condition precedent to the meeting of the minds because there's already been an agreement on all substantive issues. Therefore, this court should see this case as identical to that of General Teamsters Local 662. PolyCon then tries in its brief to say that Indiana state contract law somehow applies to this dispute. But as an initial matter, Section 10E of the National Labor Relations Act bars PolyCon from raising any issues before the court that it didn't previously raise before the board. Even if this issue were to be considered, it's worth noting that Indiana state contract law has nothing to do with this case. The duty to collectively bargain arises from Section 8D of the act, and therefore the federal statute and not state law govern this dispute. PolyCon then somehow insists on some understanding of contract law that would allow a CBA to not be effective until the parties have signed the agreement. In effect, this would allow PolyCon to delay signing until after a decertification petition has been filed before the board. More importantly, PolyCon's reluctance to sign a document with typographical errors is of no benefit to its case. This is a risk that a party faces when signing any contract under any contract law regime. It's also worth noting that between May of 2013 and now, PolyCon hasn't raised any other typographical errors or any other disputes in the document of the collective bargaining agreement that's been submitted to it, indicating that there's probably no errors of that kind. It's also worth noting that Article 7 of the collective bargaining agreement to which the parties had agreed includes a dispute resolution grievance procedure through which the parties could arbitrate any disagreements about the text of the collective bargaining agreement. If during the term of the agreement there is a dispute, then PolyCon can have an arbitrator weigh the text of that agreement against some kind of bargaining history. Finally, the company's briefs nowhere mention the contract bar rule. Under this rule, which the board has long imposed and has been applied by this court, a collective bargaining agreement prevents a decertification petition from being considered for the life of the contract or three years, whichever is shorter. The union has an irrebuttable presumption of majority status during that time the moment the contract becomes effective. Therefore, the moment there was a meeting of the minds on May 3, the decertification petition filed on May 22 doesn't invalidate the previously established meeting of the minds. If this court has no further questions, then the board respectfully requests that the court enforce the board's order. Okay, thank you, Mr. DePant. Mr. Johnson, you want another minute or so? So let me ask you, you're in Merrillville, aren't you? I am, sir. Isn't that where PolyCon is? Yes, sir. Is Merrillville a big city? No. So it wouldn't take you too long to talk to President Merrillville about your work for them? It would not, Your Honor. So on May 3, when you sent this, you know, language is fine, did you think you had to clear that with President PolyCon or the board or something like that? Did you clear that with them before you sent that? The client was relying on me to draft proposals. I did not clear it before I sent it because the client was relying on me to make sure that the contract was in conformity with both State and Federal. So you didn't try to clear your language is fine with PolyCon before you sent it to the union? Not in advance. But were you empowered at that point to say it's fine? I wasn't empowered to bind the client. Why not? You're their lawyer. When we were sitting in collective bargaining together with the client there, with the CFO with me, the client was there and the client could be bound. Are you clearing your oral argument with PolyCon? Of course not. Why not? You're speaking for PolyCon. Are you authorized to? I'm authorized to speak for PolyCon. But you weren't authorized to say that your language is fine. You weren't authorized to do that. I wasn't authorized to enter into a final and binding collective bargaining agreement first contract. Were you authorized to say your language is fine? The language was fine with me with regard to the union security clause, of course. But you weren't authorized to represent that it was fine with PolyCon? To bind the client in a final agreement? No, sir. That's very strange, actually. I mean, usually lawyers are authorized. I no longer have sympathy with you. You're a volunteer. I had the authority to negotiate what I thought was agreeable language to the client on behalf of the client and to submit it to the client for ultimate review and signature. That was consistent with Mr. Berkowitz's email to me when he sent me the document who said he had no objection. Why didn't you clear your language is fine with PolyCon, given your proximity to it, before you sent that to the union? Because the client would have relied on my advice as to whether or not the language dealing with the union security... Well, wait. That's backward. First you say that you have to clear it with them. Now you say you didn't have to clear it in advance because the company trusts you. Well, you're asking two different questions. You're asking about did I have the authority to bind the client to a first collective bargaining agreement and then your question deals... Why didn't you ask the client whether it was okay for you to tell them the language is fine? Because I was dealing with a particularly legal issue that the client would have relied upon. No, no, but you can't have it both ways. You say you had to get approval afterwards, but if you'd gotten approval before, a lot of confusion and disagreement would have been avoided. The company would have said that's fine or that's no good, right? Instead, you went out on a limb and you give the union the impression that everything is fine and then you pull the rug out from under them. My apologies, Judge. That's simply incorrect. No, it isn't incorrect. You didn't clear this with your client beforehand, even though you regarded it as crucial. If it's a fight, you're not going to win. I agree. I understand. I had no authority to bind the client to their first ever collective bargaining agreement. I understand. I had authority to negotiate the language that was of a peculiarly legal nature. We were in the process of trying to get a draft together so that the draft could be submitted to the client. That process was contemplated in Mr. Berkowitz's email when he sent me the draft agreement. We were going to review it and then we were going to initial each page because we had spent two and a half years in collective bargaining and things had changed over two and a half years. If you look, for instance, at the draft agreement, what you'll see is that there was no pay increase in the collective bargaining agreement. There were things that had occurred over two and a half years that needed to be addressed, and that was going to occur after that, after we concluded the language negotiation with regard to the right-to-work statute. Just as with any contract, the lawyer is negotiating the contract within certain general parameters that are expressed by the client. Ultimately, when a draft is produced, that document is reviewed with the client to make sure that the client that's ultimately negotiated by virtue of the back-and-forth reflects the desires of the client. So when you submitted to Polycon, your language is fine. They said that's no good. Is that what you're saying? No, sir. Okay. You've lost me. Okay, well, thank you very much. Thank you so much. We'll have to move on to our next case.